IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>vs.<br><br>ALLEN Z. WOLFSON, et al.,<br><br>               Defendants. | ORDER & MEMORANDUM DECISION<br><br><br><br>Case No. 2:02 CV 1086 TC |

      The Securities and Exchange Commission filed this civil action in response to a "pump and dump" securities scheme, alleging that Defendants violated multiple securities laws in relation to the artificial inflation of the stock price of Freedom Surf, Inc. This matter is before the court on the SEC's Motion for Summary Judgment Against Defendants Allen Z. Wolfson, Mervyn A. Phelan, Sr., and John W. Cruickshank, Jr. No party has identified any disputed material facts precluding the entry of the requested summary judgment and the court concludes that the SEC's position has merit. Therefore, for reasons outlined below, the court GRANTS the SEC's motion.

## Background

      The following factual exposition is taken from the SEC's memorandum in support of its motion for summary judgment. In its memorandum, the SEC identifies numerous evidentiary sources that support its request for summary judgment. (See Plf. SEC's Statement of Material Facts as to Which no Genuine Issue Exists and Plf.'s Mem. in Supp. of Mot. for Summ. J.

Against Allen Z. Wolfson, Mervin [sic] A. Phelan Sr., and John W. Cruickshank Jr. ii-iii (identifying and describing twenty-six different evidentiary sources).) Included in those sources is a transcript of the hearing at which Mr. Wolfson entered a guilty plea to criminal charges arising from the fraudulent scheme that is the subject of this civil case. (See id. at i.)

No party submitting briefing on this motion has meaningfully opposed the facts as presented by the SEC and the court accepts those facts as undisputed for the purpose of resolving the present motion. The court acknowledges that Mr. Wolfson takes exception to any implication that he participated in an initial private offering of Interstate Capital Corporation stock. But Mr. Wolfson's participation in that initial offering is not material to the claim for which the SEC now seeks summary judgment. As discussed below, Mr. Wolfson has already admitted under oath--in the criminal proceeding against him--that he took the actions that form the basis of the SEC's current, civil complaint against him.

The court also notes that while Mr. Cruickhank submitted several "clarifications" in response to the SEC's factual statements, he conceded the accuracy of those factual statements in all material aspects.

The Scheme

Mr. Wolfson, Mr. Phelan, and Mr. Cruickshank each played key roles in a securities scheme designed to artificially inflate the stock price of Freedom Surf, enabling the scheme participants to sell the artificially inflated stock and reap windfall profits. While all three of the defendants subject to the present motion for summary judgment were active participants in the scheme, the SEC concedes that Mr. Cruickshank's role was comparatively minor. In essence, Mr. Cruickshank aided the defendants by preparing and filing various reports with the SEC as well as with the National Association of Securities Dealers.

The "pump and dump" scheme began in 1999 when Mr. Phelan caused Interstate Capital Corporation, a "shell" corporation he controlled, to issue five million shares of stock in a private placement to twenty-six shareholders. The stock was issued under Rule 504 of Regulation D of the Securities Act, which exempts certain securities transactions from registration requirements. See Regulation D, 17 C.F.R. § 230.504. Mr. Phelan caused the stock issuance to occur just two days before new, more restrictive, regulations governing Rule 504 offerings took effect.

Mr. Phelan represented in his SEC investigation testimony that he knew all of the twenty-six shareholders who purchased the Interstate Capital Corporation stock. To obtain the stock, each of the twenty-six shareholders paid $245 into an escrow account that was controlled by Mr. Phalen, Craig Brown, and Mr. Phalen's son, Mervyn A. Phelan, Jr. Additionally, the twenty-six shareholders signed an agreement ceding control over sales of the Interstate Capital Corporation shares to a company controlled by Mr. Phelan, Mr. Brown, and Mr. Phelan, Jr. The issued stock certificates were initially kept in a safe at Mr. Phelan's office and were later moved to Centralized Escrow, which held the stock subject to Mr. Brown's direction.

In the fall of 1999, Mr. Phelan met Raece Richardson, the founder of Freedom Wetsuits, a company that manufactured wetsuits and other surf-related apparel. After learning that Mr. Richardson was struggling with high operating costs, Mr. Phelan suggested that Freedom Wetsuits merge with Interstate Capital Corporation to form a publically traded company called Freedom Surf. Mr. Richardson agreed, and the companies merged in November of 1999. Following the merger, Mr. Richardson assumed the role of president and CEO of the newly formed company and served in those capacities until August of 2000.

In his allocution, Mr. Wolfson admitted under oath that he agreed to take steps to artificially inflate the price of Freedom Surf stock. (See Aff. of Bonnie S. Kartzman, dkt. #154,

Ex. B, Wolfson Allocution [hereinafter "Wolfson Allocution"] 18 ("On April 1999 through December 2000, myself and other business associates agreed to artificially manipulate the price of Freedom Surf stock."); id. ("As a result of my agreement, the price of the stock was caused to rise from $10 per share to $40 per share.").)  According to Mr. Wolfson's sworn statement, he "agreed to raise the price of the stock in order to defraud investors" and that "[t]he whole purpose of this was to enrich myself as well as others."  (Id. at 20-21.)

The artificial inflation process began when Mr. Phelan, Mr. Brown, and Mr. Phalen Jr. allowed Mr. Wolfson to receive 345,000 shares of Freedom Surf stock at no cost.  (See, e.g., Aff. of Bonnie S. Kartzman, dkt. #154, Ex. V, Phelan, Jr. Allocution 18 ("I arranged to provide some common stock of Freedom Surf to an individual named Allen Wolfson with the understanding Wolfson would manipulate the price of the stock by increasing the bid and arranging controlled sales.").)  Mr. Wolfson deposited the shares into two accounts under his control at broker-dealer Olsen Payne and Company: A-Z Professional Consultants Retirement Trust and World Alliance Consulting, Inc.  Mr. Wolfson told Kevin Kirkpatrick, who served as Mr. Wolfson's broker at Olsen Payne throughout the relevant time period, that he wanted to trade the Freedom Surf stock.  Mr. Wolfson also made contact with Robert Pozner, a broker-dealer at Glenn Michael Financial Corporation.  Mr. Pozner agreed to be a market maker in Freedom Surf stock at Glenn Michael.

Over the next several months, Mr. Wolfson caused the price of Freedom Surf stock to rise by calling in ever-higher bid and ask prices to Mr. Kirkpatrick and Mr. Pozner.  During his allocution, Mr. Wolfson admitted under oath that "a further result of my agreement was that shares were given to certain nominees under my control and I repeatedly raised bid and ask price to create the false appearance of market demand for the stock.  All of the demand that was generated for the stock was in Canadian accounts controlled by me."  (Wolfson Allocution at

18.)  Between July and October of 2000, Mr. Wolfson caused Mr. Kirkpatrick to raise Olsen Payne's posted bid price for Freedom Surf stock from $5 to $40.

Around the same time that Mr. Wolfson was artificially raising the price of Freedom Surf stock, Mr. Phelan, Mr. Phelan, Jr., and Mr. Brown met with Paul Koupas, a broker-dealer at Salomon Grey Financial Corporation.  Mr. Koupas informed Mr. Phelan that he was capable of buying a large volume of Freedom Surf shares at a discounted rate.  Interested in making such a sale, Mr. Phelan contacted Mr. Richardson and informed him that Freedom Surf needed to split its stock to bring down the price per share, which would make the stock more liquid and enable Salomon Grey to purchase the stock.

On October 12, 2000, Freedom Surf stock underwent a 4:1 split, reducing the price per share to $10.50.  About two weeks after the stock split, when the stock was valued at $12.25 per share, Mr. Wolfson delivered 25,000 Freedom Surf shares to Salomon Grey at a 50% discount from the current bid price.  Salomon Grey paid Mr. Wolfson $153,125 for the shares.

Mr. Wolfson kept half of the proceeds of that sale and gave the other half to Mr. Phelan, Mr. Phelan, Jr., and Mr. Brown.  Mr. Wolfson's take from the sale was $76,562.50.  Mr. Phelan's take was $25,521.  Salomon Grey marked up the price of the Freedom Surf stock and sold the bulk of the shares to fifteen of its customers, turning a profit of $129,810.

Near the end of October, the original twenty-six shareholders of Interstate Capital Corporation signed shareholder escrow agreements.  The agreements allowed the shares issued in the Rule 504 offering to be printed with Centralized Escrow named as trustee.  The agreements also allowed a company called International Capital Group, which was controlled by Mr. Phelan, Mr. Phelan, Jr., and Mr. Brown, to direct the escrow agent with regard to the shares.

At Mr. Brown's direction, Katie McGee, the owner of Centralized Escrow, opened a

brokerage account at Travis Morgan Securities, Inc.  The brokerage account was later taken over by American Investment Services.  Near the end of 2000, Mr. Brown directed Ms. McGee to authorize the transfer of approximately 525,000 shares of Freedom Surf stock into the escrow brokerage account.  Mr. Brown told Ms. McGee to sign eight stock transfer documents in blank so that he could direct further transfers of escrowed stock into the brokerage account for eventual sale.  By June of 2001, Mr. Brown had directed the transfer of over two million shares of Freedom Surf stock into the brokerage account.  Taking into account the 4:1 stock split, Mr. Brown transferred nearly 4.7 million shares of Freedom Surf stock into the brokerage account between January and July of 2001.

While Mr. Brown transferred the stock to the brokerage account, Mr. Phelan, Jr. managed the task of selling the stock.  Between March and July of 2001, Mr. Phelan, Jr. sold the equivalent of just under four million shares of Freedom Surf stock, receiving proceeds in the amount of $144,636.  Those proceeds were wired to Key Dome, Ltd., an entity formed by Mr. Phelan, Mr. Brown, and Mr. Phelan, Jr.  Key Dome had a bank account at Bank of America, over which Mr. Brown had signing power.  That account was used to pay for overhead, including Mr. Cruickshank's salary.  The money in the account was eventually split between Mr. Phalen, Mr. Brown, and Mr. Phalen, Jr.   Mr. Phalen's share of the proceeds attributable to the sale of escrowed stock totaled $48,212.

Both Mr. Wolfson and Mr. Phalen were subjected to criminal prosecution for their roles in the Freedom Surf "pump and dump" scheme.  Mr. Wolfson pleaded guilty and Mr. Phalen was found guilty following a ten-day jury trial, see United States v. Wolfson, 160 Fed. Appx. 95, 96 (2d Cir. 2005).  The SEC now requests summary judgment in this civil action, arguing that the undisputed facts show that Mr. Wolfson, Mr. Phalen, and Mr. Cruickshank violated securities

laws. Mr. Phalen has not filed an opposition to the SEC's motion, and Mr. Cruickshank has filed an opposition challenging only the SEC's requested remedy. The court will therefore address the arguments raised by Mr. Wolfson in his opposition and then discuss the SEC's requested remedy.

### Standard of Review

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." Liberty Lobby, 477 U.S. at 252. See also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").

### Analysis

Both Mr. Wolfson and Mr. Cruickshank have filed oppositions to the present motion for summary judgment. Mr. Wolfson argues that summary judgment is inappropriate because there are disputed material facts. In contrast, Mr. Cruickshank, in his self-styled "limited" opposition, concedes that he "fully and completely understands his culpability in this matter, knows he was

wrong and should be punished for his actions," but argues that the SEC's requested remedy is unfair as applied to him. (Def. John W. Cruickshank's Clarification of Material Facts Used to Supp. Plf.'s Mot. for Summ. J. and Limited Opp'n to Mot. for Summ. J. [hereinafter "Cruickshank Opp'n"] 2.) Mr. Cruickshank states that "[t]he purpose of filing this limited opposition is to object to the Commission's request for disgorgement, the request for a penalty assessment and to the request that the monies be paid over to the Court within ten days." (Id. at 3.) Mr. Phalen has filed no opposition to the SEC's motion.

No party has disputed the accuracy of the SEC's legal analysis establishing Mr. Wolfson, Mr. Phalen, and Mr. Cruickshank's liability under the facts alleged by the SEC. The court has reviewed that analysis and concludes that it has merit. As discussed more fully below, the court rejects Mr. Wolfson's contention that disputed material facts preclude summary judgment and therefore the court adopts the SEC's legal position that Mr. Wolfson, Mr. Phalen, and Mr. Cruickshank are liable as alleged in the Complaint. After discussing Mr. Wolfson's argument that material disputed facts exist, the court will then address the SEC's requested remedy and Mr. Cruickshank's objections to the imposition of that remedy.

Mr. Wolfson's Opposition

In his opposition, Mr. Wolfson essentially argues that he was uninvolved or unaware of certain facts outlined in the SEC's memorandum in support of summary judgment. Specifically, Mr. Wolfson claims that he was not involved in the initial private offering of Interstate Capital Corporation stock, that he was unaware of prior illegal activity in which Mr. Richardson had allegedly engaged, and that he was unaware that Freedom Surf stock certificates "were locked up in the offices of Phelan Senior." (Aff. in Supp. of Trial by Jury and Statement of Facts Which Genuine Issues Exist [hereinafter "Wolfson Opp'n"] 2-4.)

Mr. Wolfson has failed to dispute any fact that is material to the outcome of the present motion. The SEC has alleged that Mr. Wolfson violated the Securities Act by offering or selling securities in interstate commerce without a registration statement in effect. Additionally, the SEC has alleged that Mr. Wolfson violated the anti-fraud provisions of the Securities and Exchange Acts when he artificially inflated the price of Freedom Surf stock.

To establish that Mr. Wolfson offered or sold stock without a registration statement in effect, the SEC must show that (1) no registration statement was in effect for the securities, (2) that Mr. Wolfson directly or indirectly sold or offered to sell the securities, and (3) that interstate means were used in connection with the offer or sale. See SEC v. Cavanagh, No. 98 Civ. 1818DLC, 2004 WL 1594818, at *15-16 (S.D.N.Y., July 16, 2004) (citing DeMaria v. Andersen, 318 F.3d 170, 173 (2d Cir. 2003)).

To establish that Mr. Wolfson violated the anti-fraud provisions of the Exchange Act, the SEC must establish that

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003). To establish that Mr. Wolfson violated the anti-fraud provisions of the Securities Act,

> the government must prove (1) the offer or sale of any security by the use of instruments of interstate commerce, and (2) fraudulent conduct in connection with that offer or sale, such as the use of any scheme to defraud or the omission of material facts necessary to make statements not misleading.

U.S. v. Dowlin, 408 F.3d 647, 658 n.5 (internal quotation and citations omitted). In his opposition, Mr. Wolfson has raised no allegations that undermine the evidence presented by the

SEC in support of its motion for summary judgment on the claims outlined above. In fact, the centerpiece of the evidence against Mr. Wolfson is the transcript of Mr. Wolfson's allocution, wherein he admits under oath to the salient facts underlying the SEC's claims.

First, although the SEC consistently characterizes the initial private offering of Interstate Capital Corporation stock under Rule 504 as a "sham" considering that it occurred only two days before more restrictive regulations took effect, the SEC has not alleged that Mr. Wolfson is guilty of any wrongdoing in relation to that offering. Therefore, Mr. Wolfson's contention that he was not involved in the offering of Interstate Capital Corporation stock is not material to the resolution of the SEC's current motion. Rather, the SEC identifies Mr. Wolfson's sale of 25,000 shares of Freedom Surf stock to Salomon Grey as the transaction that violated sections 5(a) and 5(c) of the Securities Act, which prohibit the sale of unregistered securities. It is Mr. Wolfson's involvement with that transaction that is material to this motion. (Compl. ¶110.)

Further, the SEC's allegations against Mr. Wolfson relating to section 17(a) of the Securities Act and section 10(b) of the Exchange Act are not dependant on any wrongdoing by Mr. Wolfson at the time of the initial private offering. Indeed, in his allocution, Mr. Wolfson admitted, under oath, that (1) he agreed to artificially manipulate the price of Freedom Surf stock during the period from April through December 2000, (2) that he caused the price of that stock to go to approximately $40 per share, (3) that all the demand for the stock was generated by him, (4) that he repeatedly raised the bid and ask price of Freedom Surf stock to create the false appearance of market demand for the stock, (5) that he caused Freedom Surf stock to be delivered to Solomon Grey for sale to public investors, and (6) that the whole purpose of the scheme was to enrich himself as well as others. (See Wolfson Allocution at 8-9, 18-21.

In short, Mr. Wolfson has admitted under oath to all the elements of the fraud allegations

alleged in the SEC's Complaint. As the SEC notes, Mr. "Wolfson's limited contention that he was simply unaware of the 1999 Regulation D offering at issue here is irrelevant." (Plf.'s Reply to Def. Wolfson's "Aff. in Supp. of Trial by Jury and Statement of Facts Which Genuine Issues Exist" 4.)

Second, Mr. Wolfson's contention that he was unaware of Mr. Richardson's prior involvement in illegal securities actions is completely irrelevant to the allegations raised by the SEC in this action. Even if Mr. Wolfson is correct that Mr. "Richardson is the real person guilty of defrauding investors," (Wolfson Opp'n at 3), Mr. Richardson's culpability would not operate to relieve Mr. Wolfson of the consequences caused by his conduct, as admitted in his allocution.

Third, Mr. Wolfson's contention that he was unaware that the Freedom Surf stock was locked in Mr. Phalen's office is irrelevant. As discussed above, Mr. Wolfson has admitted under oath that he committed acts establishing that the SEC's fraud claims are meritorious. Even if true, the fact that Mr. Wolfson was not aware of the physical location of the Freedom Surf stock would not undercut the factual basis supporting his liability.

The Remedy

As a remedy for Mr. Wolfson, Mr. Phalen, and Mr. Cruickshank's securities violations, the SEC requests that the court enter an order that (1) requires the three men to disgorge all money obtained from the sell of Freedom Surf stock with prejudgment interest assessed; (2) imposes civil penalties; (3) permanently enjoins Mr. Wolfson and Mr. Phalen from violating sections 5(a), 5(c), and 17(a) of the Securities Act and section 10(b) of the Exchange Act; (4) permanently enjoins Mr. Cruickshank from violating section 10(b) of the Exchange Act; (5) bars Mr. Phelan and Mr. Cruickshank from serving as an officer or director of any public company; and (6) bars Mr. Phelan from participating in any offering of penny stock.

Only Mr. Cruickshank has opposed the SEC's request for relief and his opposition is confined to an assertion that he should not: (1) be required to disgorge the gain he received as a result of his participation in the Freedom Surf stock scam, (2) be required to pay prejudgment interest, and (3) be subject to a civil penalty. Mr. Cruickshank also argues that he is financially unable to pay any penalty imposed by the court and that the imposition of any monetary obligation will force him to violate the court order. But "[w]hen a party is absolutely unable to comply [with a court order] due to poverty or insolvency, inability to comply is a complete defense. Otherwise, the party must pay what he or she can." SEC v. Musella, 818 F. Supp. 600, 602 (S.D.N.Y. 1993).

The court will address each of the SEC's requested remedies in turn and will address Mr. Cruickhank's objections to those remedies when appropriate.

*Injunctions Against Future Violations of Securities Laws*

This court has the authority to permanently enjoin Mr. Wolfson, Mr. Phalen, and Mr. Cruickshank from violating federal securities laws under section 20(b) of the Securities Act and section 21(d) of the Exchange Act. The court may impose such injunctions when granting summary judgment. SEC v. Am. Commodity Exchange, Inc., 546 F.2d 1361, 1363, 1369 (10th Cir. 1976). Permanent injunctions of this type are appropriate when the court finds past violations of securities laws and a reasonable probability of future violations. See SEC v. Commonwealth Chem. Secs., 574 F.2d 90, 99-100 (2d Cir. 1978). Because the SEC has established that Mr. Wolfson, Mr. Phelan, and Mr. Cruickshank violated securities laws, the only question that remains is whether there is a reasonable probability that these three defendants will violate securities laws in the future.

To determine the likelihood of future violations, the court analyzes several factors,

including the degree of scienter, the egregiousness of the violation; whether the opportunity for future violations will exist, and whether the party has acknowledged and taken responsibility for past violations.  See SEC v. Pros Intern, Inc., 994 F.2d 767, 769 (10th Cir. 1993).  Here, the court is persuaded that injunctions are appropriate.  Each of these three defendants participated in an orchestrated, multi-step scheme to make windfall profits at the expense of the public.  No party has raised any argument suggesting that injunctions would be inappropriate.  Because the court finds the SEC's request for permanent injunctions meritorious, the court grants that request.

*Disgorgement and Prejudgment Interest*

In addition to the permanent injunctions just discussed, the SEC has also requested that Mr. Wolfson, Mr. Phalen, and Mr. Cruickshank disgorge all gain flowing from the Freedom Surfe scheme.  "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws."  SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1474 (2d Cir. 1996).  Due in part to often complicated nature of securities fraud, courts have held that the amount of disgorgement should reasonably approximate the amount of gain obtained through violations of securities law and that any uncertainty in amount should be calculated against the wrongdoer.  See SEC v. Patel, 61 F.3d 137, 139-40 (2d Cir. 1995).  The court concludes that disgorgement is an appropriate remedy in this case.

Mr. Cruickshank argues that he should not be required to disgorge his gains, however, because part of his gain was paid to him in the form of a salary and because his sale of his own Freedom Surf stock--which he was given as partial compensation for his work in the scheme--occurred after the price of that stock dropped significantly.  But Mr. Cruickshank has already admitted his liability in this matter and does not dispute that the money identified by the SEC for

disgorgement came to him as a result of his involvement in the Freedom Surf scam. The court therefore rejects Mr. Cruickshank's contention and orders that the defendants disgorge the following amounts: Mr. Wolfson, $76,562.50; Mr. Phalen, $73,733; and Mr. Cruickshank, $36,895; which amounts are adequately supported by the record evidence.

The SEC has also requested that the court impose prejudgment interest on the amounts defendants are required to disgorge. The decision to impose prejudgment interest is left to the broad discretion of the court. See First Jersey, 101 F.3d at 1476. Prejudgment interest is awarded to prevent wrongdoers from receiving, in essence, an interest-free loan. See SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).

> In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) consideration of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance.

First Jersey, 101 F.3d at 1476 (internal quotation omitted).

Under the facts of this case, the court concludes that the imposition of prejudgment interest is appropriate. The only party that has opposed the SEC's request for prejudgment interest is Mr. Cruickshank. But Mr. Cruickshank's challenge is essentially confined to his contention that other parties have not been ordered to pay prejudgment interest. (See Cruickshank Opp'n at 13 ("Because interest has not been imposed on other defendants in this case who are admittedly more culpable that Cruickshank, the Court should use its discretion to deny the imposition of such interest on any amount the court decides should be disgorged.").)

The court is not persuaded by Mr. Cruickshank's assertion that the imposition of prejudgment interest would be unfair as to him. Mr. Cruickshank was an active participant in the

Freedom Surf stock scheme with Mr. Wolfson and Mr. Phalen. Considering the remedial nature of the statute and the equities involved, the court concludes that each of the three defendants should be responsible for prejudgment interest on the amounts set for disgorgement. Specifically, prejudgment interest is set in the following amounts: Mr. Wolfson, $22,671; Mr. Phalen, $22,659; and Mr. Cruickshank, $10,195. These amounts were submitted by the SEC based on calculations using the Internal Revenue Service's tax underpayment schedule that has been approved by courts for this purpose. See First Jersey, 101 F.3d at 1476. No party has challenged the accuracy of the amounts and the court adopts the SEC's calculations.

*Civil Penalties*

The imposition of civil penalties for violations of securities laws advances the goal of encouraging investor confidence while also deterring future violations of securities laws. See SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998). Such penalties may be imposed on summary judgment. See, e.g., SEC v. Freeman, 290 F. Supp. 2d 401, 404 (S.D.N.Y. 2003). Civil penalties may imposed under section 21(d)(3) or the Exchange Act and section 20(d) of the Securities Act. When "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" results in substantial losses or the creation of a significant risk of substantial losses to other people, section 21(d)(3) of the Exchange Act and section 20(d) of the Securities Act allow a court to impose a "third tier" penalty of up to $110,000 for a natural person.

The SEC has requested the imposition of third tier penalties against Mr. Wolfson and Mr. Phalen, and the imposition of a "second tier" penalty against Mr. Cruickshank. Mr. Cruickshank is the only party that has challenged the appropriateness of the SEC's request for the imposition of civil penalties. Mr. Cruickshank's objection reads more like a brief in favor of the imposition

of civil penalties against Mr. Phalen, Jr., and Mr. Brown than a coherent argument challenging the imposition of penalty against him. (See Cruickshank Opp'n at 15.) Beyond arguing that other participants in the Freedom Surf scheme have not been subjected to civil penalties, Mr. Cruickshank makes the bald assertion that the SEC's recommendation that a civil penalty be imposed against him "is completely arbitrary and without any basis in fact or reason." (Id.) The court disagrees. There is a substantial amount of record evidence that supports the SEC's request for the imposition of a civil penalty against Mr. Cruickshank, not the least of which is Mr. Cruickshank's own admission of his involvement in the scheme. Considering Mr. Cruickshank's level of involvement, the court concludes that a second tier penalty is more than reasonable.

Therefore, the court imposes civil penalties in the following amounts: Mr. Wolfson, $110,000; Mr. Phalen, $110,000, and Mr. Cruickshank, $55,000.

*Officer and Director Bar*

The SEC has also requested that the court bar Mr. Phalen and Mr. Cruickshank from serving as an officer or director of any public company. A court may impose such a bar when a person violates section 10(b) of the Exchange Act and committed acts that demonstrate "substantial unfitness to serve as an officer or director." 15 U.S.C. § 78u(d)(2). Courts typically consider six factors when deciding whether to impose such a bar: (1) the egregiousness of any underlying securities law violation, (2) the defendant's repeat offender status, (3) the defendant's role or position at the time of the violation, (4) the degree of scienter, (5) the defendant's economic stake in the violation, and (6) the likelihood that misconduct will occur again. See Patel, 61 F.3d at 141.

No party has disputed the appropriateness of the SEC's request. Even Mr. Cruickshank, in his opposition, stated that "he does not disagree that the Court should bar him from any future

service on a board of directors or as an officer of any public company." (Cruickshank Opp'n at 10.) The court has reviewed the rationale offered by the SEC in support of the requested bar and finds that it has merit. Therefore, the court bars Mr. Phalen and Mr. Cruickshank from serving as a director or officer of any public company.

*Penny Stock Bar*

The SEC has also requested that Mr. Phalen be barred from participating in any offering of penny stock. The court has the ability to impose such a bar under section 21(d)(6) of the Exchange Act and section 20(g) of the Securities Act. When deciding to impose such a bar, the court looks at essentially the same factors that govern the imposition of an officer or director bar. See SEC v. Steadman, 603 F.2d 1126, 1140 (5th Cir. 1979).

No party has opposed the SEC's request. The court has reviewed the rationale for the bar as articulated by the SEC in its memorandum and concludes that the request has merit. Therefore, the court bars Mr. Phalen from participating any offering of penny stock.

## Conclusion

For all the foregoing reasons, the court GRANTS the SEC's Motion for Summary Judgment against Mr. Wolfson, Mr. Phalen, and Mr. Cruickshank and orders as follows:

(1) Mr. Wolfosn and Mr. Phalen are permanently enjoined from violating sections 5(a), 5(c), and 17(a) of the Securities Act, section 10(b) or the Exchange Act and Rule 10b-5 thereunder.

(2) Mr. Cruickshank is permanently enjoined from violating section 10(b) of the Exchange Act.

(3) Defendants are hereby ordered to disgorge the following amounts: Mr. Wolfson, $76,562.50; Mr. Phelan, $73,733.00; and Mr. Cruickshank, $36,895.00.

(4)    Additionally, the court orders the defendants to pay prejudgment interest in the following amounts: Mr. Wolfson, $27,671; Mr. Phelan, $22,659; and Mr. Cruickshank $10,195.

(5)    The court also imposes civil penalties on Mr. Wolfson and Mr. Phelan in the amount of $110,000 each. Mr. Cruickshank is assessed a penalty of $55,000.

(6)    Mr. Phelan and Mr. Cruickshank are barred from serving as officers or directors of any public company.

(7)    Mr. Phelan is barred from participating in any offering of penny stock.

SO ORDERED this 4th day of May, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge